IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

WASICA FINANCE GMBH and
BLUEARC FINANCE AG,

      Plaintiffs,

v.

SCHRADER INTERNATIONAL, INC.,
SCHRADER-BRIDGEPORT
INTERNATIONAL, INC., SCHRADER
ELECTRONICS LIMITED, and
SCHRADER ELECTRONICS INC.,

      Defendants.

C.A. No. 13-1353-LPS

Jeremy D. Anderson, FISH & RICHARDSON P.C., Wilmington, DE

Michael J. Kane and Jason M. Zucchi, FISH & RICHARDSON P.C., Minneapolis, ME

    Attorneys for Plaintiffs


Jeremy A. Tigan, MORRIS, NICHOLS, ARSHT & TUNNEL LLP, Wilmington, DE

Brian P. Collins and Robert M. Fuhrer, PILLSBURY WINTHROP SHAW PITTMAN LLP, McLean, VA

    Attorneys for Defendants

**MEMORANDUM OPINION**

March 4, 2019
Wilmington, Delaware

**STARK, U.S District Judge:**

Plaintiffs Wasica Finance GmbH and BlueArc Finance (together, "Wasica") sued Defendants Schrader International, Inc., Schrader Bridgeport International, Inc., Schrader Electronics Limited, and Schrader Electronics, Inc. (together, "Schrader"), alleging that Schrader infringes Wasica's U.S. Patent No. 5,602,524 ("the '524 patent"). (D.I. 60) The asserted patents describe devices for monitoring the air pressure in pneumatic tires. (*See* '524 patent, Abstract)

Presently before the Court are the parties' disputes over the meaning of certain claim terms in the asserted claims. The parties submitted technology tutorials (D.I. 56, 58) and claim construction briefs (D.I. 54, 57, 62, 63). Wasica submitted objections to Schrader's technology tutorial. (D.I. 69) Wasica also moved to strike testimony from Schrader's expert, Dr. Ronald Williams, as to indefiniteness.[1] (D.I. 68) The Court held a claim construction hearing on December 3, 2018. (D.I. 80 ("Tr."))

## I.   LEGAL STANDARDS

### A.   Claim Construction

The ultimate question of the proper construction of a patent is a question of law. *See Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 837 (2015) (citing *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 388-91 (1996)). "It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (citation and internal quotation marks omitted). "[T]here is no magic formula or catechism for conducting claim construction."

---

[1] The prejudice to Wasica, in conjunction with consideration of all pertinent factors, does not warrant striking the challenged testimony. *See Meyers v. Pennypack Woods Home Ownership Assn.*, 559 F.2d 894, 904–05 (3d Cir. 1977), *overruled on other grounds*, *Goodman v. Lukens Steel Co.*, 777 F.2d 113 (3d Cir. 1985). The Court will deny Wasica's motion.

1

*Id.* at 1324. Instead, the court is free to attach the appropriate weight to appropriate sources "in light of the statutes and policies that inform patent law." *Id.*

"[T]he words of a claim are generally given their ordinary and customary meaning . . . . [which is] the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Id.* at 1312-13 (internal citations and quotation marks omitted). "[T]he ordinary meaning of a claim term is its meaning to the ordinary artisan after reading the entire patent." *Id.* at 1321 (internal quotation marks omitted). The patent "specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

While "the claims themselves provide substantial guidance as to the meaning of particular claim terms," the context of the surrounding words of the claim also must be considered. *Phillips*, 415 F.3d at 1314. Furthermore, "[o]ther claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment . . . . [b]ecause claim terms are normally used consistently throughout the patent." *Id.* (internal citation omitted).

It is likewise true that "[d]ifferences among claims can also be a useful guide . . . . For example, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim." *Id.* at 1314-15 (internal citation omitted). This "presumption is especially strong when the limitation in dispute is the only meaningful difference between an independent and dependent claim, and one party is urging that the limitation in the dependent claim should be read into the independent claim." *SunRace Roots Enter. Co., Ltd. v. SRAM Corp.*, 336 F.3d 1298, 1303 (Fed. Cir. 2003).

2

It is also possible that "the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs." *Phillips*, 415 F.3d at 1316. It bears emphasis that "[e]ven when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1372 (Fed. Cir. 2014) (quoting *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004)) (alteration in original) (internal quotation marks omitted).

In addition to the specification, a court "should also consider the patent's prosecution history, if it is in evidence." *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996). The prosecution history, which is "intrinsic evidence," "consists of the complete record of the proceedings before the [Patent and Trademark Office] and includes the prior art cited during the examination of the patent." *Phillips*, 415 F.3d at 1317. "[T]he prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*

"In some cases, . . . the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva*, 135 S. Ct. at 841. "Extrinsic evidence consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980. For instance, technical dictionaries can assist the court in determining the meaning of a term to those of skill in the relevant art because such dictionaries "endeavor to

3

collect the accepted meanings of terms used in various fields of science and technology." *Phillips*, 415 F.3d at 1318. In addition, expert testimony can be useful "to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Id.* Nonetheless, courts must not lose sight of the fact that "expert reports and testimony [are] generated at the time of and for the purpose of litigation and thus can suffer from bias that is not present in intrinsic evidence." *Id.* Overall, while extrinsic evidence "may be useful to the court," it is "less reliable" than intrinsic evidence, and its consideration "is unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Id.* at 1318-19. Where the intrinsic record unambiguously describes the scope of the patented invention, reliance on any extrinsic evidence is improper. *See Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1308 (Fed. Cir. 1999) (citing *Vitronics*, 90 F.3d at 1583).

Finally, "[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). It follows that "a claim interpretation that would exclude the inventor's device is rarely the correct interpretation." *Osram GmbH v. Int'l Trade Comm'n*, 505 F.3d 1351, 1358 (Fed. Cir. 2007) (quoting *Modine Mfg. Co. v. U.S. Int'l Trade Comm'n*, 75 F.3d 1545, 1550 (Fed. Cir. 1996)).

**B.  Indefiniteness**

A patent claim is indefinite if, "viewed in light of the specification and prosecution history, [it fails to] inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014). A claim may be indefinite if the patent does not convey with reasonable certainty how to measure a

4

claimed feature. *See Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1341 (Fed. Cir. 2015). But "[i]f such an understanding of how to measure the claimed [feature] was within the scope of knowledge possessed by one of ordinary skill in the art, there is no requirement for the specification to identify a particular measurement technique." *Ethicon Endo–Surgery, Inc. v. Covidien, Inc.*, 796 F.3d 1312, 1319 (Fed. Cir. 2015).

## II. CONSTRUCTION OF DISPUTED TERMS

The asserted patent is entitled "Device for Monitoring the Air-Pressure in Pneumatic Tires Fitted on Vehicle Wheels." Claim 6, which is the only asserted claim, relates to a "device for monitoring the air pressure in the air chamber of pneumatic tires fitted on vehicle wheels."

### A. "signal-generating device which generates an identification signal which is unique for the transmitter and clearly identifies same"

**Wasica**
"signal-generating device" means "a device that is part of the claimed transmitter that generates an identification signal"

"generates an identification signal which is unique for the transmitter and clearly identifies same" means "produces an electrical signal that only one of the transmitters in the vehicle uses for identification and that clearly identifies that particular transmitter from the other transmitters in the vehicle"

**Schrader**
"signal-generating device" is a part of the claimed transmitter, distinct from the emitter-control device, that creates the data or sequence of values/digits that represent the unique identification information for the transmitter

"identification signal" refers to the unique identification information stored in the transmitter

**Court**
"signal-generating device" means "a device that is part of the claimed transmitter that generates an identification signal"

"generates an identification signal which is unique for the transmitter and clearly identifies same" means "produces an electrical signal that only one of the transmitters in the vehicle uses for identification and that clearly identifies that particular transmitter from the other transmitters in the vehicle"

5

This disputed term appears in claim 1 (from which claim 6 depends), which recites, in relevant part, "wherein the transmitter comprises . . . *a signal-generating device which generates an identification signal which is unique for the transmitter and clearly identifies same*" (emphasis added).

The parties' central dispute regarding this term is whether, as Schrader contends, the "signal-generating device" must itself create the underlying data contained in the "identification signal" or whether, as Wasica contends, the signal-generating device could instead use an identification signal that was pre-loaded onto the device at the time of installation. (D.I. 57 at 10; D.I. 54 at 12)

The Court agrees with Wasica. The intrinsic record does not support limiting the "signal-generating device" to one that generates a unique identifier for a transmitter entirely internally. While the claimed "signal-generating device" must produce an identification signal, nothing in the claim requires the uniqueness of the signal that is produced to have been derived from the signal-generating device itself. Moreover, as Wasica points out, the specification explicitly contemplates a manufacturer storing a predetermined identification signal in the emitter and receiver. ('524 patent, 4:43-49, 9:49-53) ("[T]he emitter and the receiver can have the respective identification signal and the identification reference signal stored already by the manufacturer.") Schrader's construction would exclude this disclosed embodiment, an outcome which (as Schrader acknowledges) is disfavored. (*See* Tr. 28; *see also Broadcom Corp. v. Emulex Corp.*, 732 F.3d 1325, 1333 (Fed. Cir. 2013) ("[A]n interpretation which excludes a disclosed embodiment from the scope of the claim is rarely, if ever, correct.") (internal quotation marks and citation omitted))

Schrader contends that the signal-generating device must be a distinct component from the "emitter-control device" because the two are claimed separately. (D.I. 57 at 10-12) However, as Wasica points out, the same physical structure can satisfy multiple limitations. *See Intellectual Prop. Dev., Inc. v. UA-Columbia Cablevision of Westchester, Inc.*, 336 F.3d 1308, 1320 (Fed. Cir. 2003). Here, the specification does not appear to describe any embodiments in which the "signal-generating device" and the "emitter-control device" are separate, discrete components. Instead, the specification describes signal generation and emission as occurring by the concerted operation of several components. (*See* '524 patent, 6:46-51) ("[T]he identification signal of the transmitter is also stored in digital form in this memory (23). By means of the microprocessor the signals to be transmitted are converted into an emitter signal and led to an emitter output stage (25). This signal is transmitted from the emitter output stage (25) to an antenna.") Therefore, this is not a situation in which satisfying multiple claim limitations with the same structure would render the claims "nonsensical," *Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1255 (Fed. Cir. 2010), or where "the specification plainly describes the two components as separate," *Gaus v. Conair Corp.*, 363 F.3d 1284, 1288 (Fed. Cir. 2004).

Schrader contends that "convert[ing]" the signals to be transmitted is different than "generating" those signals. (D.I. 62 at 6-7) To Schrader, "generating" the signal must involve creating the unique identifier for the transmitter. (*Id.*) But Schrader fails to identify any intrinsic support for this contention. Its expert declaration (D.I. 62 Ex. C) cannot be relied on in light of the unambiguous intrinsic evidence with which it is in tension. *See Pitney Bowes*, 182 F.3d at 1308.

### B.     "constant frequency"

| |
|---|
| **Wasica** <br> "the modulation of digital information from the signals onto the carrier wave does not vary the frequency of the carrier wave" |
| **Schrader** <br> "the frequency of the electromagnetic waves does not change during the entirety of the transmission of at least the pressure transmitting signal and identification signal, regardless of whether each bit is a 1 or a 0" |
| **Court** <br> "the modulation of digital information from the signals onto the carrier wave does not vary the frequency of the carrier wave during transmission of at least the pressure transmitting signal and identification signal" |

This disputed term appears in claim 6, which recites, in relevant part, that "transmission of the signals from the transmitter to the receiver is carried out with electromagnetic waves of *constant frequency* acting as carrier waves" (emphasis added).

The parties do not seem to disagree as to the meaning of "constant frequency" in the context of the asserted claim. For instance, the parties agree that transmitting a signal using frequency shift keying (FSK) would not be transmitting at constant frequency. (D.I. 54 at 19-20) The parties also agree that transmitting a signal using only amplitude shift keying (ASK) or only phase shift keying (PSK) would be transmitting at a constant frequency. (D.I. 62 at 9-10) Instead, the parties' dispute goes to which signals emitted from the transmitter are covered by the "constant frequency" limitation. Wasica contends that only the pressure transmitting signal and the identification signal must be constant frequency; other signals emitted by the transmitter need not be constant frequency. (D.I. 63 at 17-18; Tr. 39-40) Schrader counters that all signals transmitted, including but not limited to the pressure transmitting signal and the identification signal, must be constant frequency. (D.I. 57 at 19; Tr. 42-44)

8

The Court agrees with Wasica that the "constant frequency" limitation only applies to the pressure transmitting signal and the identification signal. This conclusion arises from the plain language of the claims. Claim 6 recites "[a] monitoring device . . . wherein transmission of *the signals* . . . is carried out with electromagnetic waves of constant frequency" (emphasis added). The only two "signals" that have antecedent basis in this claim are the "pressure transmitting signal" and the "identification signal."

Schrader's contention that the specification serves to limit the claims is unpersuasive. Schrader relies on a passage which states: "[i]t has already been suggested to use the frequency shift keying method for transmitting tire air pressure . . . . With this method, however, two frequencies must be transmitted which increases the cost on the side of the transmitter and receiver." (D.I. 57 at 18-19; '524 patent, 7:36-41) Schrader concludes from this statement that any device that transmits any non-constant frequencies would incur the cost burden noted in the specification and, therefore, would not practice the invention. (Tr. 43-44) But the patent's observation that a transmitter using FSK may be more costly than one that does not is hardly, here, an expression of "manifest exclusion or restriction." *Liebel-Flarsheim*, 358 F.3d at 906.

Schrader's prosecution disclaimer argument is similarly unavailing. Schrader contends that Wasica, in an *inter partes* review ("IPR") and subsequent appeal, put forward the construction that Schrader now proposes. (D.I. 57 at 18-20) Specifically, Schrader points to Wasica's description of the "constant frequency" limitation as a "particular way of transmitting digital information, in which the waves' frequency does not change (i.e., is constant) regardless of [whether] each bit of information is a 1 or 0;" and Wasica's description of a non-constant frequency as one "where the system changed the waves' frequency to communicate whether each bit was a 1 or a 0." (D.I. 51 at 7) Nothing in either of these statements amounts to a "clear

9

and unmistakable" disavowal of all transmission of non-constant-frequency signals by the claimed transmitter. *See Omega Eng'g, Inc, v. Raytek Corp.*, 334 F.3d 1314, 1325-26 (Fed. Cir. 2003).

### C. "received from the receiver"

| Wasica |
|---|
| Plain and ordinary meaning: "the data displayed by the display device is received by the display device from the receiver" |

| Schrader |
|---|
| Indefinite |

| Court |
|---|
| "the data displayed by the display device is received by the display device from the receiver" |

This term appears in claim 1, which recites, in relevant part, "a display device which is connected with the receiver and displays data as numbers or symbols which have been taken from the pressure transmitting signal *received from the receiver*" (emphasis added).

Schrader argues that the term "received from the receiver" is indefinite. (D.I. 57 at 8-10) Under Schrader's constructions of "pressure transmitting signal" and "receiver . . . which receives the pressure transmitting signal," the receiver receives the pressure transmitting signal wirelessly. (*Id.* at 8) Yet, to Schrader, the phrase "received from the receiver" suggests that the receiver *transmits* the wireless pressure transmitting signal. (*Id.*) Thus, to Schrader, "received from the receiver" is indefinite because a *receiver* that *transmits* a wireless pressure transmitting signal is inconsistent with the specification. (*Id.* at 9-10) Wasica responds that "received from the receiver" refers to data taken from the pressure transmitting signal that is received by the display device from the receiver. (D.I. 54 at 10)

Schrader has not met its burden to show, by clear and convincing evidence, that the specification and claims fail to inform those skilled in the art about the scope of the invention

10

with "reasonable certainty." *Nautilus*, 134 S. Ct. at 2129. Instead, the specification supports Wasica's construction. For instance, Figure 5 is reproduced below:



The patent describes how, in one embodiment, four receiver parts (E1 to E4) receive signals, process them, and convey them to a microprocessor (66). (*See* '524 patent, 7:64-8:31) The microprocessor (66) then displays the measured pressure on a display (73) via a signal processing device (71). (*Id.* at 8:32-35, 8:42-9:24) Reading this description, a person of ordinary skill would be reasonably certain that the data displayed by the display device is received by the display device from the receiver. In other words, a person of ordinary skill would understand the phrase "received from the receiver" to modify the word "data."

### D. "pressure transmitting signal" and "receiver ... which receives the pressure transmitting signal"

|  | "pressure transmitting signal" | "receiver ... which receives the pressure transmitting signal" |
|---|---|---|
| **Wasica** | "a signal sent by a transmitter to a receiver that contains air pressure information" | The claim language already indicates that the "receiver" is part of the claimed device and states that the receiver "receives the pressure transmitting signal." Plaintiffs disagree with the inclusion of the term "wirelessly" to describe the nature of the transmission of the "pressure transmitting signals." |
| **Schrader** | "a wireless signal sent by a transmitter to a receiver that contains air pressure information" | "a part of the claimed device that receives the pressure transmitting signals wirelessly" |
| **Court** | "a signal sent by a transmitter to a receiver that contains air pressure information" | "a part of the claimed device that receives the pressure transmitting signals" |

The disputed terms appear in claim 1. The parties' disagreement centers on whether the "pressure transmitting signal" must be, as Schrader contends, a wireless signal, or, as Wasica contends, a "pressure transmitting signal" can be wireless or non-wireless. (D.I. 54 at 8-10; D.I. 57 at 6-7; D.I. 63 at 1-3)

The plain meaning of the term "signal" includes non-wireless signals, and the intrinsic evidence does not disturb that understanding. "Even when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction.'" *Liebel-Flarsheim*, 358 F.3d at 906.

Schrader, for its limiting construction, relies on the specification, which states:

> Since the vehicle wheel rotates during travel and a mechanical transmission of the measurement signals from the rotating wheel onto the non-rotating parts of the vehicle is ***normally not possible*** due to lack of space, the transmission of the measurement signals ***must be*** carried out by way of a wireless transmission. Therefore,

12

> apart from infrared transmission and ultrasonic transmission, above all, electromagnetic signal transmission is offered.

('524 patent, 1:51-59) (emphasis added) The Court does not read this passage – which is in the background section of the patent and characterizes practical difficulties faced by the prior art – as limiting. The passage does not describe the invention or the meaning of "pressure transmitting signal." Moreover, stating that mechanical transmission is "normally" not possible implies that sometimes mechanical transmission may be possible. Most importantly, that a signal is transmitted wirelessly in one part of a system does not preclude the signal from also being transmitted through a wire elsewhere in the system.

Schrader also contends that Wasica's representations during the IPR and related appeal support Schrader's "wireless" construction. (D.I. 57 at 7) Specifically, Schrader points to: (1) Wasica's expert's statement that the field of the art relates to "wireless transmission systems" for tire pressure monitoring (D.I. 51 Ex. 2 at 14); (2) Wasica's statement that the person of ordinary skill in the art had experience in "wireless transmission systems" (*id.* at 18); and (3) Wasica's characterization of the '524 Patent as being directed to "wirelessly transmitting" (*id.* at 6). These statements, individually and collectively, do not amount to a "clear and unmistakable" intention to disavow non-wireless signals. *See Omega Eng'g, Inc, v. Raytek Corp.*, 334 F.3d 1314, 1325-26 (Fed. Cir. 2003).

### E. "further processing"

| |
|---|
| **Wasica** <br> "further processing of data obtained from the pressure transmission signal by the receiver and display device so that the data may be displayed" |
| **Schrader** <br> Indefinite for (1) reciting a method step in an apparatus claim, or (2) reciting a function to be performed without identifying any structural element or a means (under 35 U.S.C. § 112, ¶ 6 (pre- AIA)) for performing that function |

| Court |
|---|
| "further processing of data obtained from the pressure transmission signal by the receiver and display device so that the data may be displayed" |

This disputed term appears in claim 1, which recites, in relevant part, that:

> the receiver comprises a comparison device which checks if an identification signal transmitted from a transmitter has the relationship criteria to identification reference signal stored in the receiver, and that *further processing* of the pressure transmission signal taken from the receiver only takes places if the identification signal received by the receiver and the identification reference signal stored in the receiver fulfill the relationship criteria . . . .

(emphasis added).

Wasica contends that "further processing" should be given what it contends is the term's plain meaning. (D.I. 54 at 16) Schrader asserts that "further processing" is indefinite. (D.I. 57 at 14-18)

The Court will adopt Wasica's construction, which is consistent with the specification. The specification discloses an embodiment in which "[a]fter receipt of a signal, the comparison circuit checks if the identification signal matches the stored identification signal. If this is the case, the corresponding data value is evaluated and transmitted to the central receiving component (EZ)." ('524 patent, 8:45-59) The specification further discloses that the central receiving component (EZ) includes a display that shows data taken from the pressure transmitting signal. ('524 patent, 8:24-30) This supports Wasica's construction: "further processing of data obtained from the pressure transmission signal by the receiver and display device so that the data may be displayed."

Schrader has failed to demonstrate, by clear and convincing evidence, that one of skill in the art about would not understand the scope of the invention with reasonable certainty." *Nautilus*, 134 S. Ct. at 2129. Schrader's argument that "further processing" is an indefinite

14

method step in an apparatus claim lacks merit; the phrase is better understood as a functional limitation on components recited in the claims (namely, the "receiver" and the "display device"). *See BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1366 (Fed. Cir. 2017) ("The *Nautilus* standard of 'reasonable certainty' does not exclude claim language that identifies a product by what it does.").[2]

Schrader has also failed to demonstrate a lack of structure sufficient to overcome the presumption against means-plus-function claiming. *See Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015). Finally, Schrader's discussion of correcting errors in claims (*see* D.I. 57 at 17-18) (citing *Novo Industries, L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1357 (Fed. Cir. 2003)) is irrelevant because Wasica's construction is proper under the *Phillips* standard.

### F. "switching device"

| | |
|---|---|
| **Wasica** "an electrical or mechanical device or mechanism, which can bring another device or circuit into an operating or nonoperating state" | |
| **Schrader** 35 U.S.C. § 112, ¶ 6 (pre-AIA)  The function is the plain and ordinary meaning recited in the claim. The corresponding structure is a manually activated physical switch or keyboard, or multiple such switches with one for each wheel position, as described | |
| **Court** "an electrical or mechanical device or mechanism, which can bring another device or circuit into an operating or nonoperating state" | |

---

[2] Schrader analogizes this case to *Rembrandt Data Technologies, LP v. AOL, LLC*, 641 F.3d 1331, 1339 (Fed. Cir. 2011), which held that a claim was indefinite where it failed to recite any structure for performing the "transmitting" step. Here, by contrast, the claims recite several physical components such as a "receiver," a "comparison device," and a "display."

15

This disputed term appears in claim 1, which recites, in relevant part, "the receiver is connected with *a switching device* which enables the receiver to switch over from normal operating mode, in which the air pressure is monitored, to pairing mode, in which the receiver collects the identification signal of the transmitter and stores this as an identification signal" (emphasis added). The parties dispute whether "switching device" should be construed as a means-plus-function limitation pursuant to 35 U.S.C. § 112, ¶ 6 (pre-AIA).

"[F]ailure to use the word 'means' . . . creates a rebuttable presumption . . . that § 112, para. 6 does not apply." *Williamson*, 792 F.3d at 1348. This presumption can be overcome "if the challenger demonstrates that the claim term fails to 'recite sufficiently definite structure' or else recites 'function without reciting sufficient structure for performing that function.'" *Id.* The proper inquiry is "whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure." *Zeroclick, LLC v. Apple Inc.*, 891 F.3d 1003, 1007 (Fed. Cir. 2018) (citing *Williamson*, 792 F.3d at 1348).

Here, Schrader has not overcome the presumption against a means-plus-function construction. The specification does not explicitly define "switching device." In similar situations, the Federal Circuit has often "looked to the dictionary to determine if a disputed term has achieved recognition as a noun denoting structure, even if the noun is derived from the function performed." *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1360 (Fed. Cir. 2004) (collecting cases), *overruled on other grounds by Williamson*, 792 F.3d at 1339. Wasica cites to two technical dictionaries which define "switching device" (in a common manner), which the Court views here as strong evidence that the term would have a known

16

meaning to a person of ordinary skill. (*See* D.I. 55 Appxs. B, C)[3] Schrader's expert testimony (D.I. 62 Ex. C ¶¶ 33-35) is unpersuasive. *See generally Phillips*, 415 F.3d at 1318 ("[C]onclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court.").

Schrader's remaining arguments also lack merit. While the word "switching" is functional (D.I. 57 at 13-14), "defining a particular claim term by its function is not improper and is not sufficient to" render a term means-plus-function. *Hill-Rom Servs.*, 755 F.3d at 1374-75. "Indeed, many devices take their names from the functions they perform. The examples are innumerable, such as 'filter,' 'brake,' 'clamp,' 'screwdriver,' or 'lock.'" *Id.* Finally, Schrader's contention (D.I. 62 at 7) that Wasica's construction does not fit the claims relies on an incorrectly narrow view of Wasica's construction. The pairing mode is in a "nonoperating state" when the claimed device is in its normal operating mode, and the normal operating mode is in a "nonoperating state" when the device is in pairing mode.

## III. CONCLUSION

The Court will construe the disputed terms as explained above. An appropriate Order follows.

---

[3] By contrast, in a case relied on by Schrader (D.I. 62; Tr. 80-81), *Massachusetts Inst. of Tech. & Elecs. For Imaging, Inc. v. Abacus Software*, 462 F.3d 1344, 1353-56 (Fed. Cir. 2006), the term held to be a means-plus-function limitation, "colorant selection mechanism," was not defined in the specification or any dictionary.